Good morning, counsel. My name is John Lambrose. I'm here on behalf of Mr. Collier, the appellant. It's nice to see all you Nevada lawyers here today. I think we've got a crew witness here today. I guess prior to getting to the essential question presented, it probably would be a good idea just to quickly recap what I consider to be the important procedural facts. And those are the amended judgment of convictions entry, which was on March 26, 1997. The filing of the action challenging that sentence pursuant to Nevada's motion to correct rule. And, again, it's important that the Court understand that that challenge was to the sentence, and under Nevada law was a challenge that was incident to a judgment or sentence. That occurred within a couple of months of the entry of the amended judgment of conviction in May of 1997. That action was then pending until the Nevada Supreme Court affirmed the district court's denial on the merits, which occurred in May of 99. Upon the issuance of remitted or the merits of the motion to change the illegal sentence. Yes, the motion to correct the illegal sentence. Not the merits of the underlying appeal. No. The motion, yes, not the merits of the underlying appeal. There was not an appeal. There was not a timely appeal taken from that, from the underlying judgment of conviction. As soon as the remitted or issued, and I think at this point it's probably important to just look at the statute that's in question, Nevada Revised Statute 34-726 sub 1, our one-year rule or our timeliness rule, unless there is good cause shown, to paraphrase, basically, the action must be filed within one year of the issuance of the remitted or. Now, Mr. Collier filed his petition for post-conviction relief within one year of the issuance of the remitted or, challenging the sentence, the motion to correct. We argued below in the district court that that was not a violation of Nevada law, because, quite frankly, there was no clearly up there was no clear, unambiguous Nevada rule, either statutory or case law made, that prevented that plan of attack, if you will, that prevented that particular course of action by a Nevada state prisoner. And the course of action, again, so the Court understands it, was because of the very unique nature of this case, Mr. Collier was sentenced after a change in the law where had he had his offense conduct occurred after the change of the law, the maximum exposure he would have had was 2 to 15 years. Instead, he was looking at 10 to life. What Mr. Collier did in proper person was to try to seek some kind of relief from that change in statute by just correcting his sentence. So he filed the motion to correct, waiting until that was resolved, if and ultimately when that was resolved against Mr. Collier. He then pursued his only other remedy, which was state postconviction. So really what he did was save the State of Nevada some resources by not litigating this in two separate actions. He waited, he didn't get the relief he wanted, he then said, well, you know, I have no other choice but to pursue state postconviction and attack my conviction. And that's when he brought the Roe v. Flores-Ortega, Manning v. Foster claim. My lawyer did not file a notice of appeal on my behalf, and there was indeed an actual conflict of interest because of that. As this Court is aware from the briefing, the Nevada Supreme Court, Mr. Collier was pro se from the time that he was sentenced until the time that he – that we were appointed his attorneys in the 2254 action. The Nevada Supreme Court then entered the default under 34726 sub 1, saying, you know, you were not timely. We – when Mr. Collier took this into Federal court, we challenged the adequacy of that – of that adjudication based on a couple of things. First of all, and as Bennett – this Court's decision in Bennett v. Mueller, I think, discusses, adequacy can be challenged in many ways. The adequacy in this case was challenged based on the fact that there was no clear rule. There was no clear rule, unambiguous rule, that said that Mr. Collier could not pursue his state postconviction and state post-sentencing remedies in the way in which he – he pursued those. And Judge Reed, the Court below, acknowledged that fact when he granted the Certificate of Appealability, and we excerpted that particular order in our excerpts of record for the Court's edification. That's at page 462, where Judge Reed did say, you know, to paraphrase, this is – this is a debatable question because the – because the Nevada Supreme Court, although they – you know, Judge Reed's position was in – in 1998, after Mr. Collier pursued – about a year after Mr. Collier filed his motion to correct, the Nevada Supreme Court entered a published opinion entitled Dickerson v. State. And the Dickerson opinion essentially says, look, you know, you can't file an untimely notice of appeal and start your clock over again. And at the – and at the time – you say you file your appeal four years too late, and we say, no, it's untimely and remitted are issues on that decision. We're not going to construe that untimely notice of appeal as the remitted-er that counts to start the clock for your habeas petition. Now, Dickerson – that's the holding in Dickerson, Dickerson, obviously. But that – Dickerson does not reach the question that we're talking about today, and that is essentially, for lack of a better way of putting it, the way we characterize it in the Court below and the way we characterize it in this Court, that the motion to correct essentially stops the clock, stops the 7-2-6 clock, because it is, indeed, incident to the judgment, incident to the – to the criminal proceeding under Edwards and Passanisi, and for that – for that reason, by virtue of that relatedness, stops that one-year clock until that litigation has been resolved. Yes. Kennedy. Counsel, may I ask you, do I have the date right that the motion to correct the illegal sentence was on March 21st, 1997, more than one year after the conviction of 1995? But there – but there was an amended judgment that was entered. The amended judgment simply was a technical correction of stating the statute under which he had been convicted. Isn't that true? Well, the Nevada Supreme Court, if you look at their order-dismissing appeal on the motion to correct the illegal sentence, I believe the Nevada Supreme Court, inferentially at least, and I don't want to misstate the record here, characterized the amended – well, discussed the amended judgment of conviction as the last judgment of conviction. It's our position that when they reached the order – when they reached the motion to correct the illegal sentence issue on the merits, they essentially acknowledged the amended judgment of conviction as being the last judgment of conviction in time, okay? Now, Mr. Collier did not file – and to be absolutely clear here, Mr. Collier did not file a timely notice of appeal from that amended judgment of conviction. He filed a belated notice of appeal. But it certainly is my position, it's our position in this Court and it's our position below, that the triggering date for all of these events was the – was the May 1997 amended judgment of conviction, where indeed Judge Adams, the State judge, got it right. He – he complied with Nevada law for the first time. And again, it was a technical compliance, but believe me, after 20 years of Federal habeas litigation, technicalities are not a stranger to our practice. It was a technical compliance because he had to put into the judgment of conviction, I believe, the statute of conviction. You also think it was a denial of the second ground for the lack of applicability of the 1995 statute to his crime? I think in his – in his – By fate of act? Well, it's kind of weird what happened in this case, Judge Beyer. What happened was Mr. Collier filed the motion to correct, and then the judge said, oops, you know, you're right, the statute needs to be in there, did the amended judgment of conviction, but didn't reach the – Say a word about the other guy. Yeah. But then Mr. Collier filed the same motion to correct within – And then when he pinpointed it, then he denied it. Right. That's when he reached it. I'd like to reserve my remaining time unless any of you – thank you. May it please the Court, counsel, my name is Robert Wieland, I'm a senior deputy attorney general employed by the Office of the Attorney General of the State of Nevada. I have the privilege of representing the respondents in this case. The Petitioner-Appellant's argument fails for no fewer than four reasons. The first reason that it fails, it's assuming a fact that has not been presented or proved in evidence, and that fact is that Mr. Collier somehow or another was relying on this purported ambiguity that has been discovered by the Federal Public Defender's Office. It fails because the statute in question dealing with Nevada's procedural bar makes no mention of a motion for correction of illegal sentence. The statute is very clear on its face what we are talking about an appeal from. It would be kind of like, well, let's see if I didn't – if I can create some sort of an ambiguity, does that somehow or another mean that my time runs? And that's simply not the case, and that's explained in my answering brief. It's further supported by the fact that a motion to correct an illegal sentence under Nevada's procedural bar is limited to basically one issue, is the sentence facially valid or not. That being the case, and the fact that there is an appeal process provided from a motion to correct an illegal sentence in and of itself shows that the statute is not ambiguous as Petitioner's counsel would have you believe. But if you're looking at what the proper process should be, the correction of the illegal sentence is kind of the final judgment. No, it is not. Not under Nevada law, the final judgment is the judgment of conviction. There is an order – there would be an order denying a motion to correct an illegal sentence, which is separately appealable from a judgment of conviction. That's what's provided for under Nevada law. That was the point that I was just making. The fourth – well, actually, I just made the fourth point why – or just mentioned the fourth point why the argument fails, and that is because there is a separate appeal from the denial of a motion to correct an illegal sentence. And finally, basically, what – apart from the failure of proof, the factual assumption that underlies this whole thing is that Mr. Collier somehow was actually, in fact, in his mind saying, I can do it this way. It's an issue of state law. The Nevada Supreme Court has already said it's untimely. And what Mr. Lambrose and the petitioner is asking you to do is go and look behind Nevada law, and this Court is not empowered to do that. This Court can look and see whether or not the procedural bar is consistently applied, but this Court does not have the power nor the authority to go and say, well, the Nevada Supreme Court messed up in its application, and therefore, we're entitled to some sort of benefit. That is not cause to excuse a procedural bar, nor is it a basis to find the procedural bar is inadequate. He was represented by counsel who never told him that he had a right to appeal. Is that correct? We don't know that. That's an allegation. That's an allegation which could be fleshed out if it were remanded. Well, actually, what Mr. Collier alleges as cause is that his counsel did not make such an allegation or did not explain that to him. However, as the Federal District Court explained in its order and as Respondents argued in their response, there isn't a reasonable basis upon which counsel would need to have advised him of that anyway. If one looks at what happened, Mr. Collier, as I recall, ended up with the benefit of a major bargain in this case. He had two trafficking cases lined up against him and a possession case. The possession case was part of the negotiations, dismissed as part of the negotiations, as was the third level, the other third level trafficking. He got the benefit of his negotiations. Now, it just amazes me that somebody would say, well, I've got my client. I've got, you know, he's pleading guilty to one case. But there's another case where, you know, there's potential huge enhanced penalties. There's a third case where he's got potential huge penalties. I've made it so that pursuant to the guilty plea arrangements, those two cases disappear. He can't be prosecuted for them. The State can't. Well, all of this may be true, but four days before sentencing, the new law came into effect, which substantially reduced what one should get for the crimes to which he pled. Wouldn't you expect a lawyer to appeal that? It doesn't change the fact that Mr. Collier's conduct is governed by the statute that was in existence at the time he committed his crime. Whether or not they subsequently lessened the penalties for it is absolutely irrelevant to any consideration in this case. Counsel, that all may be true, and your analysis may be correct, but we didn't know that until one appeals and finds out. And he did it by moving to correct the sentence. The sentence is still facially valid. I am not aware of any authority anywhere, Your Honor, that says that a subsequent change in the criminal law somehow or another has retroactive application unless expressly stated, which is not done in this case. Well, come on. Welcome to the Sentencing Guidelines, Counsel. Well, we're not. You say any law anywhere. That's a broad statement. I think the point Judge Fletcher is asking about is at the point of appeal, you've got change in the law, and you can say it's perfectly obvious that it didn't apply under Nevada law, but there was an appealable issue. Well, then what you're saying is that counsel is ineffective for failing to raise that particularly appealable issue, but that's not even alleged in this instance. That's not even alleged here. Well, I think it gets back to your comment that there was no basis on which no reason for counsel to have advised his client that he had a right to appeal. That's where we started this discourse. Okay. Well, there's certainly no basis under Nevada law. And maybe I said I am not aware of any law. I don't pretend to be an expert on the Federal Sentencing Guidelines. I wouldn't advise you to even try. Be that as it may, Your Honor, there is, in my estimation, and I've been practicing in Nevada for more than 25 years, absolutely no basis under Nevada law under which that issue would have succeeded. But wasn't there a comment through the enactment in 1995 to the statute itself that said that this was not applicable to any crimes committed before the effective date of the statute? All statutes in Nevada are generally like that. I don't recall if there is that specific provision in the statute, but I'm well aware of the law that says in Nevada there's a broad-based law that says unless expressly stated otherwise, it's they operate prospectively. I seem to recall some commentary at the end of the statute which said precisely that, that this was not effective to any crimes committed before the date. Well, if that's the case, then that certainly, of course, resolves any concern. He could take an appeal, but in facing 45 years, he wasn't really worried about any penalties for frivolous appeal. Well, here's the other thing, and that is, okay, let's suppose he succeeds. He's still under the law, and he's still subject to getting harmed worse than he was. So. I take your point all out. But I'm not sure that excuses counsel's responsibility to inform his client about a right to appeal. I mean, it may get to the prejudice. I mean, if we're getting into Strickland, which isn't an issue here, I grant. But we may get to the prejudice problem of Strickland, but it certainly is within all duties of all criminal counsel to tell your client you've got a right to appeal. I advise you not to for X, X, and Y reasons, and here's the time limit. I mean, I think that's pretty. A couple of points, Your Honor, in conclusion. If, and I respectfully disagree that you always have to advise your client. When I did it, well, that's irrelevant. But the point is, is what nexus does that have to his failure to comply with NRS 34-726, the one-year statute of limitations? It's got no nexus whatsoever to explain away his failure to timely file his post-conviction action. That being the case, Your Honor, I see that I'm out of time. Thank you for your attention. Thank you, counsel. Just a couple of quick points. In answer to Judge Fletcher's first question regarding the amended judgment, I take issue with Mr. Whelan's position. I think once an amended judgment in Nevada is entered, that's the final decision in that particular case. And I think that's the case with the amended judgments at the excerpts at page 181. With regard to the cause and prejudice, which I never got a chance to get into and I'm glad that Mr. Whelan talked about it a little bit, one thing I'd like this Court to remember is that the lawyer that was advising Mr. or not advising Mr. Collier with regard to his right to appeal represented the snitch that put Mr. Collier in prison, Mr. McConnell. Now, I'd like to go into that for just a second, if you would. Sure. Yes, he did, but Mr. McConnell had been given his three-year sentence. He got probation. He got probation because he was, as you call him, the snitch. The government might call him an informant. But that he was a he had been sentenced. What professional obligation under the Nevada Rules of Professional Conduct for Lawyers was Mr. Mitchell under after Mr. McConnell had been sentenced some, I think, nine months before Mr. Collier was charged by information? Was there was a term of probation that Mr. McConnell would continue to cooperate and give information, otherwise the probation would be revoked and he would be put back in put in prison? During that time, is there a professional obligation under the Nevada Rules of Professional Conduct for public defenders to continue to assist people who are on probation? Well, first of all, and I don't know the exact cite to this, but under the Nevada Rules for Professional Conduct, Mr. Mitchell had an absolute obligation to disclose to Mr. Collier that he, in fact, had represented Mr. McConnell. And he had an absolute obligation to do that because he was defending Mr. Collier in a criminal prosecution that would not have even commenced had it not been for Mr.  And the other thing that Mr. Mitchell did not know was that he was serving two masters for a client, the client that he negotiated the plea bargain agreement to set up some future person. Mr. Mitchell didn't know would be Mr. Collier, who he would stand next to at sentencing and not say one word other than we agreed at the 45 years. Now, what Mr. Mitchell should have done was he should have withdrawn. He should have he should have. Why? Well, because he was at that point he was trying to serve two masters. What what who how was he serving McConnell who had already been sentenced by doing anything on behalf of Collier or not on behalf of Collier? Because Mitchell, by virtue of his representation with McConnell, knew about every possible skeleton in McConnell's closet. To his advantage. Well, certainly not to Collier's advantage because he couldn't. I mean, you're saying that he was entitled to play God and not disclose to Mr. Collier. Listen, I know so much about McConnell that could put him in, you know, in the trash heap when it comes to an entrapment defense. He couldn't do that. And believe me, the stuff is out there. And that's why we wanted an evidentiary hearing. It really and perhaps I need to step back, catch my breath and not get so passionate here, but because I don't think I'm stating it as eloquently as I wish I could. But it just is a matter of absolute ethical, an ethical violation, for lack of a better way of putting it, to the point that Mr. Mitchell represented Mr. Collier. That sentencing, he didn't disclose his representation to McConnell. What Mitchell had learned from McConnell as to possible entrapment, do you think that he would have had the honor bound to reveal that to his new client, Collier? Oh, yes. Absolutely. Because it could be. If he had learned that in the attorney-client privilege. Well, he couldn't. That's why he had to withdraw. See, that's why Mitchell was on the horns of a dilemma. He could have kept quiet about it. Well, then he would be committing a disservice to Collier by doing that. The only disservice would be to breach his attorney-client relationship with McConnell. Yes, but also not to disclose everything he knows that could defend Mr. Collier zealously. But he doesn't have to disclose that which he's honor bound and duty bound not to disclose. Which is why he has to withdraw. Why? I mean, Collier is no worse off, is he? Yes. Collier is a lot worse off. You can say, look, Mr. Mitchell, if you'll just break your oath as an attorney, you can help me out very much, and so we set up an entrapment defense. But the predicate is he has to break his oath as an attorney. No. What I would have done, what people in our office do, is we withdraw. I'm asking about the rules. Well, the rules. We do it because of the rules, not because we're, you know, because we don't want the case. Whenever there's been a representation of someone with knowledge of the crime of the representing, then that, regardless whether there's contemporaneous representation, which I understand that conflict. But if there's been prior representation, then you must stand down? Yes, because there's – and, again, I wish I could cite these rules, and perhaps a letter brief at the end of this argument might be appropriate. But there's a rule that says that you're honor bound for former clients not to do anything that would do damage to their case or to them or however you want to put it. You're certainly honor bound to represent a current client zealously. You're also honor bound to disclose to a current client or a former client any representation that may affect their case. And once you get that close to the fire, and believe me, Mr. Mitchell was – he needed a heat-breathing – a heat-seeking missile suit to stay away from this one, you have to withdraw. You have to withdraw, conflict out, and not say anything about either case to anybody  That depends on the unspoken assumption, not so unspoken by you, that the attorney must tell his second client what he learned from his first client. Yeah, I agree. We have to disclose the conflict anyway. Pardon me? You have to disclose the conflict. Exactly. Not necessarily the contents of what I did before. Anyway, thank you for my extra time. I appreciate it. I hope I wasn't taking away from much. No, no. We appreciate that. The case just arguably submitted. That's what oral argument is about, for us to try to flesh out some of these things. Case just arguably submitted. Next case on the oral argument calendar is High v. Ignacio.
judges: B. Fletcher, Thomas, Bea